# STATE OF MICHIGAN

# COURT OF APPEALS

SHAWN RYAN EICHLER, a minor by Next
Friend ARMINDA DAWN BAKER,

Plaintiff-Appellee,

v

MODERN WASTE SYSTEMS, INC.,

Defendant-Appellant.

UNPUBLISHED
December 11, 2018

No. 338606
Lenawee Circuit Court
LC No. 15-005322-NO

Before: O'BRIEN, P.J., and K. F. KELLY and FORT HOOD, JJ.

O'BRIEN, P.J. (*dissenting*).

The mere happening of an accident is not, in and of itself, evidence of negligence. *Daigneau v Young*, 349 Mich 632, 635; 85 NW2d 88 (1957). The facts of this case are undeniably sad; in an attempt to impress a girl, an eight-year-old boy tried to do a pull-up on a dumpster, causing the dumpster to fall on top of him. The evidence at trial established that the dumpster should not have fallen, and yet it did. In my opinion, plaintiff entered no admissible evidence to establish that defendant's negligence contributed to the dumpster falling, so the trial court should have entered a directed verdict for defendant. I would also conclude that the trial court should not have admitted the child's medical bills without proper foundation, and that the trial court failed to appropriately allocate fault among the parties. For these reasons, I respectfully dissent.

On appeal, defendant argues that plaintiff's witness Steven Ziemba inappropriately gave expert testimony that the trial court relied on to render its decision. At trial, defendant moved for a directed verdict, arguing that Ziemba was not an expert, that the trial court should disregard his testimony as inadmissible, and that without Ziemba's testimony there was no question that defendant was not negligent. In denying defendant's motion, the trial court reasoned as follows:

> In this particular case with reference to Mr. Ziemba, there's no claim that he said he did anything that he didn't do. I think that Mr. Ziemba was very clear about what he did do and what he could do and what he couldn't do. I do believe that he did say that he had worked with dumpsters or disposal bins sufficiently to comfortably opine that this was not safe. There is no requirement, as you all know, for it to be a specialist or to have any particular degrees. It's nice if someone does and it's clear cut, but they never moved to have him an expert. He

-1-

never -- even when I asked them if that was their intent, it was clear to me that that was not their plan. He testified as to what he saw and what he heard.

I disagree with the trial court and agree with defendant. I would conclude that Ziemba gave expert testimony that he was not qualified to give, that the trial court's reliance on that testimony was improper, and that without Ziemba's testimony, the trial court should have granted a directed verdict to defendant.

Evidentiary decisions, including whether a witness is qualified to render an expert opinion and the admissibility of testimony, are reviewed for an abuse of discretion. *Franzel v Kerr Mfg Co*, 234 Mich App 600, 620; 600 NW2d 66 (1999). A trial court abuses its discretion if its decision is outside the range of reasonable and principled outcomes. *Ronnisch Constr Group, Inc v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016). A trial court's factual findings in a bench trial are reviewed for clear error, while its legal conclusions are reviewed de novo. *Ambs v Kalamazoo Co Rd Comm'n*, 255 Mich App 637, 651–652; 662 NW2d 424 (2003). A factual finding is clearly erroneous if, after reviewing the entire record, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Fette v Peters Const Co*, 310 Mich App 535, 549; 871 NW2d 877 (2015).

Under MRE 702:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court found that Ziemba testified not as an expert under MRE 702 but as a lay witness under MRE 701. MRE 701 provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

At trial, Ziemba testified that when plaintiff's attorney approached him about this case, he was not readily familiar with dumpster design and safety, but "was able to do some research" and "determine [the] safety of a particular type of . . . dumpster." Based on his "research"—which, apparently, only consisted of reading articles related to dumpster design—Ziemba testified that there "is what is they call a slant-side dumpster," and that the "Consumer Product

Safety Commission has looked into the dangers of these type of dumpsters since the late '70s."[1] Ziemba testified that

> the slant-type dumpster, the ones with slanted sides as opposed to vertical sides, four vertical sides, has the potential for being unstable, and they were actually banned in 1978[2] because of the unstability [sic] -- they were so unstable they actually caused injury and death to a number of children. So in retrospect what they tried to do is offer a retrofit where you could actually put bracing extensions. Sometimes they look like little feet just to prevent it from being tipped over, and they work effectively. This particular dumpster did not have it.[3]

In reference to a 1984 "product sheet" from the Consumer Products Safety Commission that outlined a number of injuries caused by slant-type dumpsters, Ziemba testified that the injuries were "because of the lack of stability of this type of refuse bin." Plaintiff's counsel then asked for "an engineering explanation," and Ziemba stated:

> Well, simple terms is everything has a center of gravity for stability. You move beyond -- like if you're standing and then you lean way over, your stability -- your center of gravity shifts and it's no longer between your shoulders or your feet. This is the same thing. Your center -- if it was a rectangular bin, the center of gravity, assuming the construction was the same, would be in the center. But now that you have this slanted bin, you have this side, this extra weight on this edge, and that shifts it from the dead center over closer to the slanted side. Now you add additional forces or weight, such as a child pulling on it or hanging on it or anybody, and it's gonna tip over.

When asked whether a dumpster should tip over when "an 80-pound child . . . does a pull-up" on it, Ziemba opined that "[i]t should not, particularly if it's on a stable level concrete pad."

Ziemba explained that the Consumer Product Safety Commission uses two tests—a horizontal push test and a vertical pull-down test—to determine whether a dumpster is safe, and recited the standards that a dumpster must meet to be deemed "safe." Ziemba testified that he

---

[1] Defendant objected to this testimony because plaintiff had not alleged a design defect in its complaint. The trial court overruled this objection because defendant had not filed "a motion in limine or any other prophylactic measure." Also of note, when defense counsel later attempted to question defendant's president about the effect of the Consumer Product Safety Commission's finding from the 1970s, the trial court sustained plaintiff's objection to the testimony because the president was "not an expert in the area of legislation."

[2] Later testimony clarified that "slant-type dumpsters" were not banned in 1978, but rather the dumpsters had to pass certain tests to ensure that they were safe.

[3] For clarity, there was no allegation nor evidence that the dumpster involved in this case was the type that was banned in 1978, nor were there any fact witnesses that testified that the dumpster that fell on plaintiff had—or did not have—retrofitting.

attempted to perform these tests on bins provided by Modern Waste that were said to be duplicates of the bins of the Bakers' dumpster that fell on plaintiff. The bin provided was at a Modern Waste facility where there were a number of other bins. According to Ziemba, the bin provided was "slightly different" than the one that was at the Bakers' because it had a "guide" extending out of the foot of the base on the slanted side.[4] Ziemba never explained how he knew that the dumpster at the Bakers' did not have a guide, and no other witness with personal knowledge of the dumpster at the Bakers' testified to whether the dumpster that fell on the child had a guide. Ziemba testified that he tried to test the dumpster provided by Modern Waste using a force gauge to see how much vertical pull it would take to tip the dumpster, and that his force gauge broke during the test without tipping the dumpster. Ziemba's force gauge only measured up to 75 pounds.

Ziemba explained that he was skeptical of the dumpster that Modern Waste provided in part because the dumpster was on concrete and the dumpster at the Bakers' was on grass when it tipped. Plaintiff entered into evidence a photo of a warning sticker on Modern Waste's duplicate dumpster, and Ziemba testified that the warning sticker stated that the dumpster was to be placed on "a hard level surface." Plaintiff's counsel asked Ziemba, "as a matter of [Ziemba's] professional opinion . . . is putting a bin such as this on grass or on dirt, is that comporting with that warning?" Ziemba replied, "That would violate that warning," and he explained that "a hard level surface" meant "concrete" or "a concrete pad."

After testing the bin provided by Modern Waste, Ziemba apparently inspected other bins on Modern Waste's property and found one without a guide and not on concrete. Ziemba testified that the bin was "not on a hard level surface," and that the surface was "a gravel, sand, dirty type surface." Ziemba testified that without the "modifications"—meaning guide—that the other dumpster had, the dumpster that Ziemba found was a "violation" of the government's regulations. Plaintiff entered a photo into evidence that Ziemba explained showed plaintiff's attorney "tipping [the dumpster] with one hand." Ziemba testified that he went on "a road trip" with plaintiff's attorney looking "for other bins from Modern Waste to determine if there were others out in the community with or without the feet," and "found at least one without it." Ziemba ultimately concluded that, in his opinion, the dumpster at the Bakers' "was definitely not safe," and that its lack of safety "was a direct cause" of plaintiff's injury.

On cross examination, Ziemba testified that "from anthropometric tables that [he has] used to measure . . . force," he would estimate that plaintiff's attorney exerted "45 pounds or less" on the dumpster to make it tip. Ziemba admitted that the dumpster that plaintiff's attorney leaned on was not on level ground, but did not testify what effect the incline had on the

---

[4] Ziemba did not testify that the extension was a "guide," but simply referred to it as an extension. Ziemba believed that the guide was "a modification of the slanted-side bin, which is allowable by the Consumer Product Safety Commission." But both Modern Waste's president and their expert testified that a guide is *only* intended to allow a garbage truck to tip the dumpster into the truck's rear hold. The garbage trucks have a lever that catches the guide and allows the dumpster to be tipped and emptied into the truck.

dumpster. Ziemba also did not testify what effect, if any, the incline of the Bakers' dumpster had on that dumpster tipping over. He also admitted that he had no "way to quantify" the difference that the guide made on the first dumpster he tested from the second dumpster. Ziemba testified that he had no knowledge, either personal or from reading deposition testimony, about the condition of the ground at the time that the dumpster fell, so "[i]t would be impossible for [him] to tell" what difference the ground made, if any.

In my opinion, the vast majority of Ziemba's testimony was clearly not "rationally based on the perception of the witness," MRE 701, but rather required "scientific, technical, or other specialized knowledge," MRE 702. Ziemba began his testimony by admitting that he did not have the requisite knowledge when he was approached by plaintiff's attorney, and his testimony was based on "research" he did after he was approached. This research was, apparently, reading technical reports that he then summarized for the Court. For instance, Ziemba read a report from the Consumer Product Safety Commission and then testified that this report banned *all* slant-type dumpsters—including the one that tipped in this case—unless the slant-type dumpster had retrofitting to make it more stable. That the Consumer Product Safety Commission's report required a certain level of technical or specialized knowledge to read and understand is somewhat obvious, but it is also illustrated by the fact that Ziemba apparently did not understand the report. Not *all* slant-type dumpsters were banned; only those that could not pass tests established by the Consumer Product Safety Commission were banned. And there was no requirement that slant-type dumpsters be retrofitted; if a slant-type dumpster passes the Consumer Product Safety Commission's tests, they are deemed safe, and only those dumpsters that fail the test must be retrofitted.[5] In short, Ziemba's testimony in this respect required technical or other specialized knowledge that Ziemba apparently did not possess, and so he provided the trial court with inaccurate information.

But the pitfalls of Ziemba's testimony did not stop there. Without reference to any dumpster that Ziemba may have tested or had any personal knowledge of, Ziemba relied on scientific, technical, or other specialized knowledge to render an "engineering explanation" for why a slant-type dumpster is less stable and more likely to tip. Obviously, if Ziemba based this opinion on a theoretical dumpster, it was not based on anything he rationally perceived, and was only based on his specialized knowledge. To make matters worse, he then opined that, generally, a dumpster should not tip if an 80-pound child were trying to do a pull-up on it. This was based entirely on his understanding of how a theoretical dumpster should function, an opinion he derived from specialized knowledge he gained as an engineer and safety consultant and not anything that he rationally perceived. Because Ziemba was admittedly not an expert, it was clearly outside the range of principled and reasonable outcomes for the trial court to accept this testimony.

_____

[5] Ziemba testified that he did not have personal knowledge of dumpster safety or design, and all of his testimony was based on his reading and understanding of the Consumer Product Safety Commission's reports. This, too, supports that he should have been qualified as an expert before testifying about the reports contents. Our court rules do not permit a witness to testify about something just because they read an article on it, and this case is a good example of why.

Ziemba also testified that the dumpster that he saw in photos at the Bakers' was the type that was banned by the Consumer Product Safety Commission, but it is unclear how he could have known this. He never testified that he was personally familiar with the different types of dumpsters (in fact, he testified that he was not familiar with dumpster design), nor did he testify that he ever personally saw one of the banned dumpsters. Even if he had, identifying a dumpster as noncompliant with federal regulations based solely on a picture would require some degree of specialized knowledge of dumpsters. Yet Ziemba, who was not an expert, opined that the dumpster at the Bakers' was, in fact, the type of dumpster that was banned, despite that there was nothing in evidence, besides his opinion, to support this claim. This testimony is especially disturbing because, as already explained, Ziemba's basic understanding of which dumpsters were banned was wrong.

And Ziemba's troubling testimony continued. He testified that all slant-type dumpsters that were not retrofitted in some way were in "violation" of federal safety regulations. Ziemba had no personal knowledge about dumpster safety regulations besides what he read, and again, a person must have some technical or other specialized knowledge to understand those safety regulations. Thus, his testimony of the safety regulations was not based on what he rationally perceived but must have been based on specialized knowledge. But Ziemba lacked this specialized knowledge, and so his testimony should not have been admitted.

Ziemba's lack of specialized knowledge—particularly his general lack of understanding of dumpsters—apparently led him to misunderstand what constituted "retrofitting" a dumpster. Ziemba testified that the "guide" on the duplicate dumpster defendant provided was intended for stability, while both defendant's president and expert explained that a guide had no such purpose. If Ziemba were an expert, there may be a question whether the guide was, in fact, intended to stabilize the dumpster. But as plaintiff admits, Ziemba was not an expert. This begs the question, how could Ziemba testify as to the guide's purpose? It was clearly not based on his personal knowledge, as he admitted that he was not familiar with dumpster design or dumpsters in general. And it was not based on anything that he rationally perceived as he could not say how much more stable a dumpster is with a guide than without one.[6]

Perhaps even more troubling is that Ziemba testified that the duplicate dumpster that defendant provided was not the same as the one that fell on plaintiff. Ziemba tested the duplicate dumpster provided by defendant but was unable to tip it over, and in fact broke his force gauge trying to do so. But according to Ziemba, the duplicate dumpster had a guide, while the one that

---

[6] While Ziemba was able to tip a dumpster without a guide but not one with a guide, he was unable to say what effect, if any, the guide had. The dumpster that Ziemba was able to tip was subject to other conditions that contributed to its tipping. Of note, the dumpster that Ziemba tipped was not on a level surface and the ground the dumpster was on was soft. This is in contrast to the dumpster that Ziemba was unable to tip that was on level, concrete ground. In my opinion, because Ziemba did not account for these other conditions, he simply had no basis to conclude that the dumpster's guide made any difference in whether Ziemba was able to tip the dumpster.

fell on plaintiff did not. Yet Ziemba was not a fact witness; he never personally observed the dumpster that fell on plaintiff, and no witness that saw that dumpster testified whether it had a guide.[7] Nonetheless, believing that a guide was a "retrofit" to make the dumpster more stable, Ziemba searched defendant's lot to find a dumpster without a guide. When he found one and was able to tip it over, he concluded that the dumpster he tipped was, in fact, the same type of dumpster that was on the Bakers' lot. This alone is surprising, but possibly more surprising is that he admitted that he did not calculate what effect, if any, the guide would have had on the dumpster that he tipped; he admitted that the dumpster that he tipped was not on a level surface but did not testify to what effect this had on the dumpster tipping; and he admitted that the dumpster that he tipped was on a loose surface that was neither concrete nor grass, but he was unable to state what effect this had on the dumpster tipping. Yet he confirmed that a softer surface, like the one that the dumpster he tipped was on, would make a dumpster easier to tip. From there, Ziemba testified that, based on "anthropometric tables," he calculated that the dumpster he tipped required a force of 45 pounds or less to tip over. To summarize, Ziemba attempted to perform the tests for the safety standards of the Consumer Product Safety Commission—which alone would require some technical or other specialized knowledge—and when his gauge broke on the first dumpster, he disregarded the tests altogether and decided to find a dumpster that he could tip over, and then tipped it over. He then used his technical knowledge to estimate the force that it required to tip the dumpster over. All said, not only should this testimony have been inadmissible because it required technical or other specialized knowledge, MRE 702, but Ziemba's failure to tie his "experiment" to the conditions at the Bakers made the "experiment" entirely irrelevant, MRE 402, or to any extent that it was relevant, unduly prejudicial, MRE 403. But as the only objection was under MRE 702, I would conclude that the trial court abused its discretion by allowing this testimony over defendant's objection that Ziemba was not qualified as an expert.

After all of this, Ziemba testified that a slant-type dumpster is not safe and that the lack of safety caused plaintiff's injury. Ziemba's conclusion that a type of dumpster was not safe could not be based on what he rationally perceived. For instance, he did not work extensively with these dumpsters to testify that *all* slant-type dumpsters, in his experience, pose a risk of injury when someone climbs on it. Ziemba also did not see the incident, so he could not testify as to what he rationally perceived about the dumpster that fell. The only way that Ziemba could conclude that the dumpster that fell on plaintiff was not safe and that the lack of safety caused plaintiff's injury was if Ziemba either had information about the conditions at the time of the accident that he could use to estimate the effect of those conditions on the dumpster falling, or if he had knowledge about the design of dumpsters to form an opinion of the safety of this type of dumpster generally and the effect that the design had on causing the dumpster to tip. But either way, Ziemba would need to use technical or specialized knowledge to determine whether the dumpster was not safe and whether that lack of safety caused the dumpster to tip. In other

---

[7] The lower court record includes pictures of the dumpster that fell on plaintiff. It is unclear from those pictures whether the dumpster had a guide. Even if it was discernable, Ziemba never testified that he based his determination that the dumpster had a guide on his review of the photos.

words, Ziemba could only have given this testimony if he was an expert, which he admittedly was not.

In sum, I believe that Ziemba's testimony was based almost exclusively on scientific, technical, or other specialized knowledge, so it should have only been admitted under MRE 702. Because plaintiff admits that Ziemba was not an expert, I would hold that his testimony was not admissible under MRE 701, and that the trial court abused its discretion by ruling otherwise.

This error was clearly prejudicial to defendant. In its ruling, the trial court found:

23. Plaintiff's Expert[8] Mr. Ziemba found the dumpster, both in design and placement inherently dangerous. This is negligence by Defendant Modern Waste Systems, Inc.

24. The negligence by Defendant proximately caused the injuries to Plaintiff.

Nowhere did the trial court state that the incline that the Bakers' dumpster sat on caused the dumpster to fall on plaintiff, nor did it find that the condition of the grassy ground contributed to the dumpster falling. Instead, it found that the dumpster was "inherently dangerous," which is a term generally reserved for product liability suits,[9] based entirely on Ziemba's testimony. But, as explained, Ziemba could not have testified that the design of the dumpster was dangerous because he was not an expert. More disturbing, Ziemba never offered testimony that the placement of the dumpster contributed to it falling on the child; he never testified as to the effect, if any, that the slight incline at the Bakers' had on the dumpster tipping, and he admitted that it was impossible for him to determine what effect, if any, the ground had on the dumpster tipping. Simply put, Ziemba was not qualified to provide testimony that the design of the dumpster was inherently dangerous, nor was he qualified to testify—and in fact did not testify—what effect the placement of the dumpster had on its tipping. The trial court's conclusion otherwise is not supported by the record, and therefore was clearly erroneous.

When defendant moved for a new judgment, the trial court walked back its earlier ruling somewhat, and stated:

There was an address [sic] with regard to excessive damage award and a verdict which was against the great -- against the greater weight of the evidence

---

[8] The trial court later clarified that Ziemba was not an expert and that its reference to him as one was a clerical error.

[9] Indeed, if the dumpster's design was inherently dangerous, then the dumpster's manufacturer, not defendant, should be liable for plaintiff's injuries. And even if defendant could be liable for using a dumpster that was inherently dangerous, it seems that plaintiff would need to establish that defendant knew the dumpster was dangerous before placing it on the Bakers' property. Even so, it is unclear why the dumpster was inherently dangerous or how defendant may have believed that it was because, by all accounts, the dumpster on the Bakers' property met the relevant safety standards, and nothing, including Ziemba's testimony, contradicts this.

pursuant to the statute required. I don't find that in light of the facts that the Court found, and I think that my findings sufficiently covered that. A few of them, although not exhaustive -- if the product was not such and if it were not situated according to the way in which it was situated, it wouldn't have fallen on this little boy, and he wouldn't have suffered the damages that he suffered.

To suggest that they drop a waste facility off and leave it to its, um, to damage another would be inappropriate. That's like setting up a gas tank next to a fire pit in my opinion. I think that those are not unforeseen circumstances. I think there is such a duty to place a dumpster on property so as to make sure it can function as it's to function.

There was a lot of discussion with regard to the weight of the products that were in there. I never found a conclusion with regard. I think my findings state may have been -- may have had building products in it, and I don't know, nor did I get a sense from either of the witnesses that spoke with any specificity, including Defendant's representatives.

Defendant's representative quite frankly did not impress the Court with his knowledge of his own product. I did not get a sense that he knew what was being used out there or how it was being used or what was currently being used.

*I found that Mr. Ziemba provided the Court with very detailed and a great deal of information that contributed to the facts as they were in this particular case.* He was not asked, nor did he present as an expert as I recall.

Defendant placed the dumpster on a grade that contributed to the likeliness of it tipping over, and in this case it did, and it tipped over on a child.

The very nature of the dumpster with the slant at the base of the bar, at the opening, suggests instability. Perhaps not in every single one, but it obviously did in this one because that's what happened.

I agree that Brenda Baker testified that the ground was not completely level, but I didn't look to Mr. Ziemba to calculate the effect. It was apparent that that factor contributed to the findings of the Court. [Emphasis added.]

As the italicized portion of the trial court's opinion makes clear, the trial court still relied heavily on Ziemba's inadmissible testimony when denying defendant's motion for a new judgment. This aside, the trial court gave a new reason for the dumpster tipping: the "grade" on which defendant placed it. Yet no one testified what effect, if any, the grade of the land had on the dumpster falling. The child's grandmother was the only witness to testify that the dumpster sat on an incline, but she described it as "a little bit of one." Pictures of where the dumpster sat—taken shortly after it tipped—show that the gradient was so slight that it is not readily noticeable. The only way for the trial court to conclude that the incline caused the dumpster to tip is by jumping to a conclusion that was based not on evidence but on what it concluded was an "apparent . . . factor." After reviewing the entire record, I cannot agree that this factor necessarily led to the dumpster tipping, especially in light of the trial court's refusal to consider

-9-

whether the garbage that was indisputably loaded into the dumpster may have been loaded improperly and contributed to the fall. That the dumpster was on "a little bit" of an incline, without some further evidence about the effect of the incline, is insufficient to support the trial court's finding, so I am left with a definite and firm conviction that the trial court made a mistake.

The trial court also appeared to double-down on its conclusion that the design of the dumpster caused the accident. It stated, "The very nature of the dumpster with the slant at the base of the bar, at the opening, suggests instability. Perhaps not in every single one, but it obviously did in this one because that's what happened." Assuming that the trial court relied on Ziemba to reach this conclusion, then that was improper for the reasons already explained. But based on the trial court's ruling, it's possible that the trial court looked at the dumpster's design and concluded on its own that it was unstable and that the unstable design caused the dumpster to tip. Yet all of the evidence at trial suggested that this design was not inherently unstable; even Ziemba admitted that he was not able to tip the duplicate dumpster provided by defendant. Perhaps more to the point, plaintiff's mother and grandmother testified that the dumpster had been on their property in the same place for four years and that they never believed it to be unstable nor had any concern for it tipping. In the face of this evidence, there is nothing, other than the fact that the dumpster tipped, to support that the design was unstable. But the fact that an accident happened is not, by itself, evidence of negligence. *Daigneau*, 349 Mich at 635. It was plaintiff's burden to establish that the accident was caused by defendant's negligently placing the dumpster where it did. No one testified that the "little bit of" an incline contributed to the dumpster tipping. All of plaintiff's evidence for what caused the dumpster to tip was Ziemba's testimony, which focused almost exclusively on the fact that the design of the dumpster was unstable. As I would conclude that Ziemba's testimony was inadmissible, I would hold that plaintiff failed to present any evidence that defendant's placement of the dumpster caused the dumpster to tip, and so the trial court should have granted defendant's motion for a directed verdict or for a new judgment.

It bears noting that, even with Ziemba's testimony, plaintiff did not carry its burden of establishing whether defendant was negligent in its placement of the dumpster. At best, Ziemba presented evidence that, given the right conditions, one of defendant's dumpsters could tip with little force. This was shown by Ziemba's "experiment" with the dumpster that he found on defendant's property. But it is common sense that virtually any dumpster can tip under the right conditions. Ziemba admitted that the conditions when he tipped the dumpster were different than the conditions for the dumpster that sat at the Bakers'. Ziemba testified that a soft ground would affect how easily a dumpster could tip, and that he tipped a dumpster on ground that was "a gravel, sand, dirty type surface," while the Bakers' dumpster was on a grassy surface. He also admitted that he was uncertain of how hard the ground was at the Bakers' when the dumpster tipped, and that without this information, it would be impossible to calculate what effect the ground may have had on the dumpster tipping. He also testified that the dumpster that he tipped was on an incline, but did not testify about the effect this incline had on the dumpster falling. While the child's grandmother testified that the dumpster on her property was on a small incline, no one, including Ziemba, measured this incline or testified how the incline affected the dumpster's fall, and Ziemba did not compare the incline at the Bakers' to the incline of the ground where he tipped the dumpster. The trial court found that "the dumpster was on ground and situated such that it should not have tipped over with the pressure of a 100 pound or less

child," but it did.  I agree that this is what the evidence suggests, but it was plaintiff's burden to prove that the dumpster fell *because of* defendant's negligence.  If, as the trial court found, "the dumpster was on ground and situated such that it should not have tipped," then the placement was *not* negligent.  No evidence was presented to establish that the dumpster fell because of defendant's negligence; no evidence established that the "little" incline or the grassy surface contributed to the dumpster's fall.  In other words, nothing established that defendant's placement of the dumpster caused it to fall, and the trial court's factual findings actually support the opposite.  For all of these reasons, I would hold that the trial court should have granted defendant's motion for a directed verdict or for entry of a new judgment.

Even assuming that defendant's negligence caused plaintiff's injuries, I disagree with the trial court's decision to not apportion fault to plaintiff or his mother.  Under MCL 600.6304, the trial court was required to allocate the fault among all parties that contributed to plaintiff's injuries, which includes nonparties under MCL 600.2957.  Both MCL 600.6304 and MCL 600.2957 are mandatory; the trier of fact "shall" determine the percentage of a party at fault and apportion damages accordingly.

Plaintiff was eight years old at the time of the accident, and therefore could be found capable of contributory negligence.  See *Stehouwer v Lewis*, 249 Mich 76, 83; 227 NW 759, 762 (1929).  Plaintiff testified that he knew he should not play on the dumpster but did it anyway.  It is undisputed that plaintiff's pulling on the dumpster caused it to fall.  Thus, plaintiff clearly breached a duty, causing the dumpster to fall and injure him.  Plaintiff's conduct indisputably contributed to his injuries, so the trial court should have apportioned some of the fault to him.  There was simply no basis for the trial court declining to do so, regardless of the dumpster's design and placement.

Defendant also contends that the trial court should have apportioned fault to plaintiff's mother, Mindy.  Parents have a duty to supervise their children. *Estate of Goodwin v Northwest Michigan Fair Ass'n*, ___ Mich App ___; ___ NW2d ___ (Docket No. 333963, issued July 3, 2018), slip op, p 7.  It was established at trial that plaintiff had behavioral issues, and that less than a month before the accident, Mindy took plaintiff to a mental health facility because of the problems she was having with his unruly behavior.  The nurse at the facility told Mindy that plaintiff required constant supervision.  And although Mindy was aware that plaintiff required constant supervision, plaintiff was playing outside unsupervised when he was injured.  Not only was he unsupervised, but Mindy was so far removed from where plaintiff was playing that she could not hear his screams when the dumpster fell on him.  Instead, neighbors heard plaintiff's screams, rushed over to him, pulled him out from under the dumpster, and then ran to plaintiff's grandmother's house to tell Mindy what happened.[10]  Mindy clearly breached her duty to

---

[10]  Strangely, the trial court declined to apportion fault to Mindy because it could not "presume . . . the lack of monitoring" based on the facts of the case.  It is unclear what the trial court believed it would be presuming.  The evidence at trial clearly demonstrated that the child was not being supervised when he was injured, and the trial court was required to apportion fault accordingly.

supervise plaintiff; had Mindy been supervising plaintiff, she could have told him to not play on the dumpster, which she testified was something that she had never warned plaintiff about before. There can be no question that Mindy's negligence in failing to supervise plaintiff contributed to his injuries, so the trial court was required to apportion a percentage of the fault to her.[11]

Lastly, defendant contends that the trial court erred by allowing plaintiff's medical expenses into evidence because plaintiff did not disclose the expenses during discovery. Again, evidentiary decisions are reviewed for an abuse of discretion. *Franzel*, 234 Mich App at 620.

The majority appropriately sums up the events surrounding plaintiff's medical expenses in the lower court:

> During trial, plaintiff's counsel sought to admit the bills and defense counsel objected. Plaintiff's attorney indicated that the bills were paid mostly through Medicaid and that there was a lien on the file. Plaintiff had to subpoena the bills and that was why they were not immediately available to defendant during discovery. Defense counsel noted that plaintiff's answer to Interrogatory 18 that asked plaintiff to "list all losses or expenses you or the minor Plaintiff have incurred as a result of the events described in the Complaint" was simply "my mileage; loss of 1 day of work" and made no reference to medical bills. Plaintiff never supplemented discovery to claim the medical bills.

I would only add that in response to defendant's interrogatory, plaintiff stated that there was no Medicaid lien, but he never corrected this response, despite the explanation at trial contradicting plaintiff's answer to defendant's interrogatory.

"A party is under a duty seasonably to amend a prior response if the party obtains information on the basis of which the party knows that . . . the response was correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." MCR 2.302(E)(1)(b)(*ii*). "If the court finds, by way of motion or otherwise, that a party has not seasonably supplemented responses as required by this subrule the court may enter an order as is just, including an order providing the sanctions stated in MCR 2.313(B), and, in particular, MCR 2.313(B)(2)(b)." MCR 2.302(E)(2). A trial court may exclude evidence not disclosed as a sanction under MCR 2.313(B)(2)(b).

Although not explicitly stated, the trial court apparently concluded that plaintiff's actions did not amount to a knowing concealment of the information plaintiff discovered after he answered his interrogatories. Yet there is simply nothing to support this conclusion. If plaintiff intended to seek medical expenses, he could have said so in his response to defendant's interrogatory, but he did not. Defendant even argued in its opening that plaintiff was not seeking

---

[11] The trial court could not simply choose to not apportion fault to Mindy and plaintiff. The apportionment of fault is mandatory; the trial court had no discretion to not apportion fault for Mindy's and plaintiff's respective negligence.

medical damages, and even then plaintiff did not proffer the medical expenses to defendant. Instead, plaintiff waited until the second day of trial and then handed the expenses to defendant. Without knowing that plaintiff intended to seek compensation for his medical expenses, defendant had no way to respond to the reasonableness of plaintiff's medical expenses, and was de facto forced to accept them. This Court should not fault defendant for failing to show whether the charges were reasonable or related to the injury when the bills were sprung on defendant at the close of plaintiff's case-in-chief. Indeed, this type of ambush is what MCR 2.302 is supposed to avoid. The trial court erred by finding that plaintiff's conduct was not equivalent to knowingly concealing the medical expenses, and it should have considered appropriate sanctions for plaintiff's conduct.

More troubling, the trial court admitted plaintiff's medical records without having them authenticated. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). Ordinarily, evidence may be authenticated by having a knowledgeable witness testify to the evidence's contents, confirming that the evidence is what the proponent claims it to be. See *People v Berkey*, 437 Mich 40, 50; 467 NW2d 6 (1991).

While plaintiff's medical bills may have been admissible under MRE 803(6) as records of regularly recorded activity, plaintiff never produced a witness to satisfy that the medical records were admissible under that rule. In fact, plaintiff never produced a witness to authenticate that the medical records were *plaintiff's* medical records and that he received the treatments identified in them. Defendant objected to the records' admission, and without any evidence that the medical records were what plaintiff claimed them to be, the trial court's decision to permit the records into evidence violated MRE 901 and was outside the range of reasonable and principled outcomes. The trial court included these medical records in its award to plaintiff, so the error clearly affected the outcome below. Thus, assuming that the trial court properly found defendant negligent, I would vacate the trial court's award amount, remand for the trial court to enter a new award that does not include plaintiff's unauthenticated medical records, and order the trial court to reapportion that award among all parties at fault, including Mindy and plaintiff.

That said, I do not believe that plaintiff presented admissible evidence to carry its burden of proving that defendant was negligent. I would therefore reverse the trial court, and remand for an entry of judgment to defendant.


/s/ Colleen A. O'Brien